## BURL ANDERSON HOWELL v. STATE OF MARYLAND

[No. 598, September Term, 1980.]

*Decided March 4, 1981.*

The cause was argued before MOYLAN, COUCH and WEANT, JJ.

*Barbara Mello* and *Harold P. Dwin* for appellant.

*Diane G. Goldsmith, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Donaldson B. Cole, Jr., State's Attorney for Cecil County,* and *Paul S. Podolak, Assistant State's Attorney for Cecil County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

Advertently or inadvertently, a manipulative and obstructionist defendant maneuvered a trial judge into the

treacherous waters between the Scylla of the Sixth Amendment's right to counsel and the Charybdis of Rule 746's 180-day mandate. The State's Attorney's Office was ready for trial at all times and did not contribute, even peripherally, to the predicament. The trial judge did not create the predicament. For reasons to be more fully explained, the predicament was exclusively the product of the defense. team — the defendant and his then privately retained lawyer. When suddenly faced with an eleventh-hour crisis, the trial judge tried, nobly and patiently, to extricate the defendant, to the extent still possible, from the predicament. He inquired insistently as to what course the defendant wished him to steer, as to which of the two perils was to be avoided at all costs, if both could not be. For his part, the defendant stood blithely and opportunistically indifferent to whether the ship of State smashed upon the rocks of *Johnson v. Zerbst,* 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 2d 1461 (1938), or plunged into the maelstrom of *State v. Hicks,* 285 Md. 310, 403 A.2d 356 (1979). "Which peril would you have me avoid?," the Captain implored. "I am saying nothing;" the passenger replied, "just make a mistake." Our undergirding holding is that we simply will not reward such naked obstructionism. The legal reasoning merely elaborates that transcendent judgment.

The appellant, Burl Anderson Howell, was convicted by a Cecil County jury, presided over by Judge William B. Evans, of (1) murder in the second degree and (2) conspiracy to murder. Upon this appeal he raises three contentions:

1. That the trial judge abused his discretion in permitting the appellant's retained counsel to withdraw his appearance three weeks before the trial was scheduled;

2. That a waiver of a right to the assistance of counsel may not be inferred from the refusal to accept a postponement of the trial even under circumstances where counsel could not be provided unless the trial was postponed; and

3. That since the appellant was compelled to surrender his right to the assistance of counsel in order to assert his speedy trial right, he should be entitled not simply to a

reversal and remand but to the total dismissal of all charges against him.

As we prepare to address the three contentions individually, there is a common denominator observation to be made. There is a point, if an entire system of justice based upon the assumption of free will is to endure, that a criminal defendant, if competent, must be treated as a responsible adult agent and may fairly be required to make at times difficult choices and then to live with such choices. This is a first principle of any sane society.

### PERMITTING THE WITHDRAWAL OF RETAINED COUNSEL

Maryland Rule 725 c 3, provides:

> "If no other counsel has entered an appearance for the defendant, leave to withdraw may be granted only by order of court. The court may refuse leave to withdraw appearance if it would unduly delay the trial of the case, would be prejudicial to any of the parties, or otherwise would not be in the interest of justice. If leave is granted and the defendant is not represented, a summons or other writ shall be issued and served on defendant for his appearance before the court for proceedings pursuant to Rule 723 (Appearance — Provision for or Waiver of Counsel)."

The appellant was indicted on August 21, 1979, for both murder and conspiracy to murder. On August 23, Richard E. Jackson, Esquire, entered his appearance on the appellant's behalf as privately retained defense counsel. On that day, therefore, the 180-day clock of Rule 746 began to tick. In the months that followed, preparations moved forward in due and unremarkable course toward a timely, mid-winter date at the trial table.

On August 24, the appellant was transferred to the Clifton T. Perkins State Hospital "for emergency treatment," because the Cecil County Sheriff reported that the appellant

was "a high suicide risk" and that the Sheriff did not have the facilities to cope with such a risk. In the meantime, appellant's counsel requested discovery and on August 31, the State filed its answer. On September 19, appellant's counsel moved to suppress physical evidence. On September 24, a plea of not guilty by reason of insanity was filed. On the same day, an election of trial by jury was made. On October 8, Clifton T. Perkins was ordered to evaluate the appellant's sanity. The medical staff forwarded that evaluation to the court on January 7, 1980. On January 16, appellant's counsel moved to reduce bond; a hearing was held on that motion the next day. A hearing on the suppression motion was scheduled for February 1, with the trial on the merits set for February 20. On January 30, the suppression hearing was postponed until February 15, at the request of the appellant.

To that point, 160 days into the 180-day countdown, no intimation had yet been given to either judge or prosecutor that all was not well within the defense camp. The alarm first clanged on January 30.

In open court on the morning of January 30, Mr. Jackson, the privately retained defense lawyer, announced that "there has been a significant change since our conference in chambers at the end of last week with Mr. Podolak [the Assistant State's Attorney] and the Court and me." Mr. Jackson informed the court that, through his conversations with another attorney, he "became aware of a potentially serious ethical problem with my continuing role as Mr. Howell's attorney." He pointed out that he would almost certainly be a witness at the suppression hearing and quite possibly at the trial. He pointed to Disciplinary Rule 5-102,[1]

---

1. Disciplinary Rule 5-102 (A) provides:

   "(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5-101 (B) (1) through (4)."

   None of the exceptions mentioned in DR 5-101 (B) are remotely applicable except (4), which provides:

mandating his withdrawal as counsel under such circumstances. He pointed out, furthermore, how he, in a bona fide effort to be as ethically correct as possible, had called the "Ethics Hotline number" provided by the Bar Association "to see if I could get a preliminary ruling, some guidance on the issue." The Bar Association representative who received the call was unable to give a clear-cut answer but indicated that he thought there was a serious problem. Mr. Jackson was advised to write a letter to the Ethics Committee of the Bar Association, but was told that they would next meet in the middle of February. He told the court that he had filed such an inquiry.

"(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case."

Disciplinary Rule 2-110 (C), dealing with the permissive withdrawal of a lawyer, points out that one of the situations where such withdrawal is appropriate is where:

"(5) His client knowingly and freely assents to termination of his employment."

As we have pointed out repeatedly in this case, the appellant did knowingly and freely assent to the termination of employment. His privately retained counsel, moreover, fully complied with the steps set out in Disciplinary Rule 2-110 (A) (2):

"(2) In any event, a lawyer shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his client, including giving due notice to his client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules."

Ethical Consideration 5-9 appended as an annotation to the Disciplinary Rules, makes it clear that the avoidance, whenever feasible, of the advocate-witness conflict is not simply for the benefit of the client but also for the benefit both of the lawyer himself and of the opposing party, who is entitled to an objective witness free from the stimulus of advocacy:

"EC 5-9 Occasionally a lawyer is called upon to decide in a particular case whether he will be a witness or an advocate. If a lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, *the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility.* The roles of an advocate and of a witness are inconsistent; *the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively."* (Emphasis supplied).

In the meantime, however, the 180-day time period was continuing to run and Mr. Jackson realized that time was of the essence. He himself studied the disciplinary rule further and concluded that he was almost certainly going to be required to withdraw as counsel. If he waited, the withdrawal would come hours before the deadline, at best, rather than weeks before. He informed the court that he had contacted the Public Defender's Office on the appellant's behalf but was told by them that they would neither involve themselves in the case nor even entertain the application "so long as there is an attorney's appearance in the case." In that regard, Mr. Jackson pointed out, with full and commendable candor, that he had run into a secondary problem in terms of the inability of the appellant or his family to raise the full fee. He concluded from this that the appellant was now eligible, in terms of indigency, to be represented by the Public Defender's Office. It was necessary, however, for his own appearance to be stricken before those other wheels could begin to turn.

He informed the court that there was an alternative, which was to postpone the case, quite probably beyond the 180-day limit, to await the arrival of the formal opinion from the Ethics Committee. Mr. Jackson then pointed out the impediment to this alternative that had just been erected by the appellant himself:

> "As I told you in chambers on Friday, I was sure Mr. Howell would agree that he would see it was to his best interest to continue and get an attorney involved, either me or somebody else, who could go ahead and give him a vigorous defense. *Ten-thirty last night Mr. Howell called me at home from the jail, told me that he had been talking with some other people whom he did not specify, and that he had changed his mind and would not come into court today and waive on the record his right to be tried within the 180 days.* He's, at this point, refusing to follow my advice in that regard, preferring to listen to other people, which is an additional problem.

But I want to make it clear to the Court that is Mr. Howell's position. Frankly, Your Honor, I think it is going to be difficult, given the factors involved — and the main factor, of course, is the ethics problem — for Mr. Howell to get an adequate defense on or before February 20th." (Emphasis supplied).

The appellant indicated unequivocally that he thought that "Mr. Jackson's testimony is crucial" to his defense and that he fully agreed to the court's allowing Mr. Jackson to strike his appearance as defense counsel. Even so, the court withheld its decision while it explored further the feasibility of getting substitute counsel aboard as soon as possible. The judge pointed out to the appellant that the Public Defender's Office or some other defense lawyer appointed by the court would be operating under the same time constraints. The appellant was asked whom he would wish, if he had his choice, to represent him. On several occasions he mentioned the local public defender, Harry Goodrick. The morning conference was recessed to be reconvened that afternoon, so that the Public Defender's Office could be contacted during the recess in order to expedite the process. By early afternoon, the court put its blessing upon preliminary conversations, on the subject of the appellant's eligibility, between the appellant and the Public Defender's Office, notwithstanding the fact that Mr. Jackson was still technically attorney of record. It was determined that the appellant was eligible for representation in terms of his indigency. Although no commitment was remotely made by the Public Defender's Office to go to trial by February 20, that Office did accede to the court's request to bypass the preliminary bureaucratic stages. In a council of war in open court involving the judge, the appellant, Mr. Jackson, the Public Defender's Office and the State's Attorney's Office, it was agreed that summonses for the witnesses for the forthcoming suppression hearing would be issued immediately and that the list of witnesses and the files of Mr. Jackson would be turned over to the public defender. Throughout all of this, however, the judge and everyone else kept warning the appellant,

repeatedly, that the February 20 deadline would probably be impossible to meet.

Only when all of this had been done, did Judge Evans permit Mr. Jackson to strike his appearance. The final and official colloquy went as follows:

"MR. JACKSON: Yes, sir, I do. I wish to say, also, for my own sake, first of all that at this moment, still counsel of record for the Defendant, I have fully advised the Defendant as to the same things that this Court has advised the Defendant; that he probably could get a continuance and that not getting a continuance will probably be prejudicial to a new counsel defending him.

He takes the position he takes, now, notwithstanding my advice and direction, in contravention to my advice as his attorney. Having said that, I also wish to move at this time that my appearance be stricken on the basis of the problems that are in the record from our discussion this morning. Specifically, the ethics problem.

I have discussed this with Mr. Howell in advance. I discussed it last night, again this morning when he came over here and just a few moments ago when he came to Court.

THE COURT: Thank you, and the Court will permit you at this time to, there's no objection to this, is there?

MR. HOWELL: Objection that he strikes himself?

THE COURT: Strikes his appearance?

MR. HOWELL: As my attorney?

THE COURT: Yes. There's no objection. Let that be shown on the record. Your motion to withdraw as attorney in the case is granted as of this date.

MR. HOWELL: Your Honor, I have no objection that I have to have him as a witness rather than an attorney.

THE COURT: Well, that's another matter. He will appear as a witness, is one way I've asked you, not as a witness, he will no longer have the control and the obligation to represent you in this case. That's what you're agreeing to, his withdrawal from this case as your attorney, is that correct?

MR. HOWELL: Yes, sir.

THE COURT: All right. Then, as I said before, your appearance will be stricken as attorney as of this time and the Court and the Clerk will so note it on the record."

The correctness of this decision by Judge Evans is the first issue before us on this appeal. This decision was made on the afternoon of January 30, 1980. Its correctness can only be analyzed in the light of circumstances as they stood on the afternoon of January 30, 1980. We will not, indeed we may not, indulge in hindsight. It was necessary for the trial judge to make his decision then and, quite properly, he did so.

We hold that his decision to permit Mr. Jackson to strike his appearance was correct. The ethical considerations virtually compelled such a decision. In terms of the consequential problem thereby created, Judge Evans cannot be charged with clairvoyant foreknowledge that the appellant would continue in his obstructionism, apparently letting the advice of his "jail-house lawyers" override the strong and contrary advice from Mr. Jackson, from the Public Defender's Office and from the trial judge himself. It was not unreasonable for Judge Evans to assume that if the Public Defender's Office concluded that it could not be ready for trial within 20 days, it would prevail upon the appellant to postpone the trial long enough to allow for proper preparation. On this ruling, therefore, we hold that Judge Evans was not in error.

As of January 30, 1980, moreover, the consequences of this ruling were locked into history as the new and then prevailing reality. The fact that Mr. Jackson, the privately retained former counsel, was officially and absolutely out of the case, was *fait accompli* as the next stage of the drama

began to unfold. As we seek to compartmentalize cleanly the distinct issues before us, that irreversible departure of former counsel became part of the backdrop against which ensuing events will be viewed.

### THE FAILURE TO ORDER A POSTPONEMENT OVER THE OBJECTION OF THE APPELLANT TO SUCH POSTPONEMENT

The appellant would frame this issue in terms of whether the trial judge denied him his constitutional right to the assistance of counsel. Such a framing of the issue would depart too far from reality. It was not the case that the trial judge denied the appellant the assistance of counsel; it was rather the case that the appellant, by his actions, denied himself the assistance of counsel. Appellate scrutiny of the trial judge, therefore, can be undertaken more accurately in terms of was the trial judge, *sua sponte,* sufficiently superhuman and sufficiently Solomon-like to protect the appellant from himself and, incidentally, to protect the trial process from the appellant's deliberate effort to sabotage it.

Judge Evans recognized full well what the appellant wanted. He observed at one point, "[H]e wants to have the best part of two worlds." He pointed out to the appellant the nature of the dilemma that the appellant was posing for the court:

> "But you don't want to continue with him, but you don't want to extend the time. You're trying to, it seems to me, somebody's telling you that this is a mandatory rule and you're going to get everything dropped from you because of this mix-up and the problem with your attorney."

Judge Evans labored patiently to explain to the appellant the problem that a newly appointed attorney would have in getting adequately prepared for a serious murder case:

> "How would you expect counsel to adequately prepare a case for you for trial, just bringing him in

here at the last minute? He's got to interview witnesses. One of the witnesses, apparently, from what I've heard today, one of the chief witnesses on your behalf, as far as the suppression hearing is concerned, is Mr. Jackson."

The appellant persisted that since Mr. Jackson (his previously privately retained counsel) would be willing to turn over his paperwork to the successor attorney, that new attorney would not need much preparation time. The court pointed out other considerations:

"Well, you've got to find out, if I were to appoint an attorney, what this attorney's schedules are, what his trial schedules are. I mean, he's just, you want me to appoint an attorney that doesn't have any clients, and the reason he doesn't have any clients, if there are such attorneys around here, is because he's not too competent, or just new, or green. . . . So how do you expect this Court, and how would you expect any attorney to adequately represent you if he doesn't have time to prepare the case?

A lawyer can't come in here and just devote his entire time to this case because I appoint him. And he may have other things planned, he may want to be going on a vacation, and he may refuse the appointment. He doesn't have to take it. I mean, I don't know what information you're getting. Maybe you think it's some way — and I don't really mean to accuse you of this — but it seems to me that the logical thing for your protection in the long run would be that you would get another attorney, that the attorney would have some opportunity to discuss the matter with you, go over the matter with you, review the case with Mr. Jackson, and try to prepare and defend you to the best of his ability.

But if, and I don't — I think we can grant a postponement on this case beyond the time required because there's a significant reason for doing so, to

protect your rights. You can't get an attorney in here in the next twenty days and prepare to defend you on a charge of murder. I certainly wouldn't want my attorney to spend a little more than what time he'll have in twenty days to come in on a case to represent me on a serious charge like this. If you think there's somebody up in the jail's been indicating to you that maybe you can whip outta this clear as a bell."

It is certainly not the case that the appellant was not informed of the difficult decision that was rapidly approaching. Judge Evans explained again and again that two constitutional protections were on a collision course. The appellant's apparent preference was for his right to a speedy trial:

"THE COURT: Well, I've gotta face certain things to see if your rights are protected at this time. And one of your rights, of course, is to have a speedy trial. Another right is to have the services of a competent attorney. And we're running into a problem here because you don't want to extend the time and you want to get an attorney to try to be prepared in the case, regardless of the suppression hearing, for trial, as I understand.

This case is twenty-one days, three weeks away. Now, we have two Constitutional rights that are running head-on into each other here. One, to have the adequate right of an attorney to represent you at all stages of the proceeding and, two, that you're to have a speedy trial. And it's just an unusual set of circumstances that we're involved in that made these come together like a couple of rams fighting up on a mountain bank, they're banging their heads together.

MR. HOWELL: Your Honor, I have been in jail close to six months, and I think it's far time that this case, you know —

THE COURT: We're trying.

MR. HOWELL: — were tried."

It was just after this colloquy that the appellant expressed his preference for Public Defender Harry Goodrick. The efforts, which we have already described in great detail, were then made to determine the appellant's eligibility for representation by the Public Defender's Office, to turn over the files of Mr. Jackson to the Public Defender, and to get the Public Defender into the case. Judge Evans went further. Over the luncheon break on January 30, he conferred with Judge H. Kenneth Mackey, the Administrative Judge for the County, and had himself, Judge Evans, designated by Judge Mackey as eligible to grant a postponement should one be requested. All of this was done with scrupulous attention to the niceties of Maryland Rule 746. Judge Evans gave the appellant fair warning that the Public Defender's Office might not be ready to go by the appointed trial date of February 20, and that, in such a case, the appellant himself was going to have to make the difficult choice:

> "This matter's raised some rather serious questions, what we're gonna do, and I have a responsibility to see that your Constitutional rights are protected as to a speedy trial, but also the other right that you're entitled to counsel, and competent counsel, at all stages of the proceedings.
>
> Right now, we're in a conflict on this and it may well be that regardless of, well, I don't know what we'll do. You want to go ahead with the trial on the 20th, and it would be rather difficult for me to think that your case could be processed through the Public Defender's Office and an attorney appointed for you and could go that fast. *So, it's really gonna be where you're gonna have to make the selection."* (Emphasis supplied).

When the court reconvened on the afternoon of January 30, Judge Evans proceeded to give the appellant a short course on the mandatory nature of Rule 746, as interpreted

by *State v. Hicks.* That discussion serves to state the issue now before us in proper terms. What we are coming to grips with is not the question of whether the appellant knowingly and voluntarily waived his right to assistance of counsel, but whether the appellant took any necessary step, required of him, to avoid the 180-day mandate of Rule 746. The court made it very clear that the State was not seeking a postponement. The court made it very clear that it was not for the judge to declare a postponement *sua sponte.* The court made it very clear, moreover, that it would rule in the appellant's favor that he did indeed have "extraordinary cause" for a postponement should he seek one. The court also made it very clear that the burden was upon the appellant so to seek:

> "[Y]ou are saying that you want to be tried within the 180 days as provided by Rule 746. And I would read to you from an opinion of the case that went down to the Court of Appeals, which was the State of Maryland against Harvey Robert Hicks, which is Number 130, September Term, 1979 Court of Appeals of Maryland and from the Court's opinion in that case, on page eight, I would read to you for your benefit and information, 'That *not only are the provisions of Rule 746 mandatory in application, but they are also binding upon the prosecutor and the defense alike. They are not mere guidelines or bench marks to be observed if convenient.'*
>
> *That's what our Court of Appeals has said,* so, the State in this case is not asking for any continuance of this case from the time it was scheduled for trial on the 20th day of February, 1980.
>
> I would indicate that you would probably have sufficient cause, extraordinary reason to ask for a continuance of this case beyond the scheduled trial date of February the 20th because of the situation of your attorney and because of the need for you to get new counsel because your attorney, as I understand, is shortly, today, going to strike his

appearance in this case and will not represent you further in this matter." (Emphasis supplied).

In a Herculean effort to put the mandatory 180-day question as clearly as possible and to obtain an answer as clear as possible, Judge Evans labored on:

"I'm giving you the chance, now. I'm going to tell you what I'm going to do unless you ask me for a postponement. You're going to get a continuance or a postponement of the show cause hearing until 1:30 p.m. on the 15th day of February, 1980. This motion to suppress will be held before Judge Mackey, here, in this Courtroom. Unless you request a postponement of the trial of this case, today, the trial, the case will be set for trial on the 20th day of February, 1980 as originally scheduled.

Now, I shall hear if you have any request for continuance at this time and I should say you do.

MR. HOWELL: I don't have any continuance. I'm not going to ask for a continuance of the date of the trial.

THE COURT: You want to go to trial on the 20th of February on the merits, if the case ever reaches that stage, is that correct?

MR. HOWELL: Yes, sir.

THE COURT: All right, you will be granted that right and the trial will stand at that date. If you get new counsel in the case, what he might do or what he might require we'll wait and see. He will be notified, of course, of your insistence of a trial date. We won't close the door, but, as entirely on it, but right now, you have made an election and if there's any postponement beyond the 20th, it's going to be at your request and you're going to do so; you're going to waive the provision of Rule 746; you're going to do it. The State is not going to do it. They are ready to go to trial and, as I told you and read to you, these laws are as binding on you as they are on the State. And I shall see it's kept that way."

The impending crisis hit on February 5. Judge Evans, the State's Attorney, the Assistant State's Attorney, the appellant, appellant's former privately retained counsel and Public Defender Harry Goodrick were all present when Judge Evans brought to everyone's attention the letter that had been sent to the appellant, dated February 2, from the District Public Defender, John W. Sause, Jr. That letter, after reciting fully the history of this case even as we have recited it, then informed the appellant that the Public Defender could not represent him unless he was willing to agree to a postponement beyond the 180-day meridian. It stated, in pertinent part:

> "The charges themselves, while not novel, are not frequently encountered in criminal practice. The number of witnesses thus far disclosed by the State is certainly large; and there are no doubt many witnesses and potential witnesses in your behalf who should be contacted. The defense of insanity and the motion to suppress involve highly technical legal matters, requiring research and study, in addition to the factual preparation which will be required for those purposes.
>
> The point need not be labored. It is enough to say, that it is as obvious to us, as it was to Judge Evans, that adequate preparation cannot be made in the time remaining between the date of your application and the dates of the hearing and trial. Under ordinary circumstances, we should seek a reasonable continuance of both proceedings; but it is our understanding that Judge Evans has already suggested this and you categorically refused to agree to any continuance. In so doing, you have precluded our accepting representation in your case."

It went on to explain:

> "[W]e cannot participate in proceedings which would at most give only an outward appearance that you were being provided the sort of defense to

which you are entitled and which this Office always strives to provide. In our opinion, that would be a gross disservice not only to you, but to all who might in any way become involved in the proceedings — and to the criminal justice system itself."

The appellant then effectively foreclosed any possibility of having Mr. Jackson, his former privately retained counsel, reappointed by the court. In answer to questions put by Judge Evans, he reiterated his belief that Mr. Jackson was a vital witness on the suppression issue, that it was his desire to call Mr. Jackson as a witness and that he fully agreed with the earlier decision to have Mr. Jackson withdraw from the case as his lawyer.

The court then made inquiry and learned from Mr. Goodrick that the Public Defender's Office considered the appellant fully eligible for representation in terms of his indigency and, further, that they were still willing to undertake his defense, provided only that he agree to the necessary postponement.

In a dozen ways, for page after page, the court thrust and attempted to pin the appellant down to a clear choice:

"Now, I've brought you here today and if you, and I'm going to give you a chance to tell this Court whether you want to be tried on the 20th of the month or not tried."

\*       \*       \*

"Now, do you want the Public Defender to represent you in this case or, and do you want to have, agree to a postponement beyond 180 days, as set forth in the rule, so you can have an attorney who can be well prepared to represent you, both at the hearing on the motion to suppress and on the trial of this case? I wanna know your answer."

\*       \*       \*

"I'm not gonna play around with you anymore. I think you're cute, I think you're getting smart, and

I think you think you're gonna put the State over the barrel. The State's ready to go to trial in this case. Unless you ask me today for a postponement, which you will be granted, both for the motion to suppress and the trial itself, these cases will go forward on the 15th, motion to suppress, and the trial on the 20th.

Now, this is your decision, not mine. You make it now or forever hold your peace. . . ."

In a dozen ways, for page after page, the appellant parried and adroitly dodged the choice:

"MR. HOWELL: Well, Your Honor, I'm not waiving my rights to counsel.

THE COURT: You say you're not. Well then, do you want a postponement in this case?

MR. HOWELL: And I would like to have counsel appointed from the Public Defender's Office, but I still want to be tried within 180 days."

\* \* \*

"MR. HOWELL: I, it appears, Your Honor, that you're giving me the choice to either waive my rights to counsel and be tried in 180 days, or not waive my rights to counsel and ask for a postponement. And I don't feel it's a fair question."

\* \* \*

"MR. HOWELL: What I want, simply, is I would like to have counsel appointed from the Public Defender's Office and I would like to be tried within 180 days."

The very transcript exudes the guile and dexterity of this appellant:

"THE COURT: All right. Let me ask you this, just, this is merely supposition. Suppose I appointed you or got a top lawyer of the whole country, maybe, Lee Bailey, we'll say, or somebody like that to rep-

resent you, or Edward Bennett Williams, in this case. And they said, well, man, we can't prepare this case and be ready by the 15th on a suppression and the 20th, would you then decide that maybe it might be wise to extend the time, or would you still want to be tried by the 20th?

MR. HOWELL: Your Honor, I can't answer that question without consulting with counsel, and I don't have any counsel.

THE COURT: Suppose I appointed a lawyer for you today and he said, 'Look, boy, no way I can prepare this case, I think you'd better get a postponement.' Would you come and ask the Court for a postponement?

MR. HOWELL: Your Honor, I feel that is an unfair question.

THE COURT: It's not an unfair question.

MR. HOWELL: I don't have counsel to consult with right now while I'm here.

THE COURT: Suppose counsel told you you needed additional time to prepare your defense, and I appointed counsel and brought him in and set him in the chair, and he said, 'We gotta have time to prepare this case.' Would you say, 'Sorry, I want to be tried by the 20th?'

MR. HOWELL: Your Honor, I don't think I should be asked to answer hypothetical questions."

Exasperated at long last with the "Artful Dodger" and recognizing the futility of asking, "A or B?," and receiving the inevitable reply, "Both," Judge Evans raised the art of questioning to a more sophisticated plane where answering became unavoidable. The required answer was no longer posed in terms of, "Say 'A' or say 'B'," but in terms of, "Speak or do not speak." Judge Evans effectively told the appellant, "If you say, 'postpone,' I will grant the postponement. If you do not say, 'postpone,' I will consider that to be an intelligent and voluntary waiver on your part of your right to the assis-

tance of counsel. Speak or keep silent. You cannot avoid this choice."

> "I will treat that your conduct in this case and your stubbornness in this case as a waiver, and an intelligent waiver of your — I don't think it's too intelligent, but you are an intelligent person — of a waiver of your right to counsel in a serious case. And if you so waive it you will be tried here and you will represent yourself in this case.
>
> Now, you have that decision to make."
>
> *    *    *
>
> "You have one alternative, to ask for an extension of time in which you can be afforded adequate counsel to represent you, or you can say you don't. If you don't, I treat it as a waiver and you will be tried without counsel, be that right or wrong as far as my rights and your Constitutional rights."

On the question of counsel, Judge Evans concluded:

> "You said you don't have to take an option. I'm saying you do. . . If you want to be tried within 180 days, then you'll be tried in that, and I find that you have intelligently waived, by your conduct here, waived your right to counsel."

We fully agree with Judge Evans. The appellant argues that the waiver provisions as spelled out federally by *Johnson v. Zerbst, supra,* and locally by Maryland Rule 719 c had not been complied with. Although by no means essential to our ultimate holding, we do not agree. A defendant may indicate his choice by his actions as well as by his words. Every advantage of having counsel and every disadvantage of proceeding to trial *pro se* were spread by Judge Evans across the face of this record with meticulous, if not tedious, reiteration. This appellant was demonstrably sensitive to the stakes of the game. The cunning employed was knowing and voluntary. The scenario, to be sure, was not garden-variety Rule 719 c, but, in the unique circumstances of this case, it was the functional equivalent. If on

the morning of trial, a defendant should shoot the only lawyer in town, he has waived counsel in the most effective way possible and further dialogue about "relinquishment or abandonment of a known right" becomes idle. This was such a situation.

Once the appellant made the decision to go forward to trial within 180 days regardless of the consequences in terms of counsel, those consequences most assuredly ensued. He had his suppression hearing on February 15 on schedule. He had his trial on February 20 on schedule. He was not represented by counsel on either occasion, as he knew full well he would not be. This was no *Faretta v. California,* 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975), situation. The appellant did not wish to represent himself. Indeed, as part of his apparent strategy to create reversible error, he repeatedly disclaimed any competence to do anything at all. After every witness for the State appeared at the suppression hearing before Judge H. Kenneth Mackey, Judge Mackey asked the appellant if he wished to cross-examine. In a litany reminiscent of the later Frank Costello, the appellant religiously intoned that he was unable to decide whether to ask questions or not because he lacked the assistance of legal counsel.

When at trial he was asked whether he wanted a court trial or a jury trial, he disclaimed all ability to exercise a choice without the benefit of a lawyer. When Judge Evans laboriously explained his prerogative in exercising peremptory challenges on voir dire examination, the appellant disavowed any ability to exercise such choices without the advice of counsel. When the appellant was asked if he wished to call witnesses, he professed total ignorance as to whether to do so or not because he lacked the advice of counsel.

The appellant, however, was never under any illusion that this would not be the inevitable consequence of his adamant insistence upon being tried within 180 days. Indeed, even before the suppression hearing, he had yet another appearance before Judge Evans on February 7. In the course of the court's assisting him to get summonses issued and to

get prepared for the suppression hearing, the subject of speedy trial versus right to counsel recurred. Once again, Judge Evans implored the appellant to be reasonable and once again he was refused:

"[Y]ou have the key to the situation. All you have to do is turn the key and you will get effective legal representation. But you are not turning the key that will help you. You might be able to turn the key by granting, going ahead and let a postponement be made in this case. It might unlock the cell door that you're in. But you're determined, as I understand it, and you can verify, we'll verify that again, that you are not gonna give one inch on postponing this trial. Now, is that correct?

MR. HOWELL: If you're asking me if I will waive my rights to the fast or speedy trial, no, sir, I will not."

Again and again, Judge Evans pointed out the consequences:

"You're gonna have to do the best you can. That's all I can say. You're gonna have to do the best you can, and the best you can may not be good at all, so that's your doing, it's not the Court's.

It's by your insistence that your trial and your, be held by the 20th, the suppression hearing be disposed of by the 15th of this month. That is your doing, nobody else's."

\*   \*   \*

"You're your own defense lawyer as far as I'm concerned, and it's a shame that you're gonna, you've taken this position, but that's the way you've done it."

\*   \*   \*

"You're gonna be tried, you're gonna have your hearing and you may not like it. You may just sit

down and do nothing and forget it and say you've
been denied effective use of counsel. . . ."

Even at that eleventh hour, Judge Evans reassured the
appellant that the postponement in order to obtain counsel
would be granted:

"And as I've told you a dozen times, if it comes
down to you finally decide that maybe you want a
postponement so we can get a defense attorney for
you, I've told you, without question, you will get a
postponement. So you don't have to worry about
that. That I would promise you."

On February 14, the day before the suppression hearing,
the appellant was back before Judge Evans in order to make
his election as to court or jury trial. The problem of counsel
versus speedy trial came up again. As clearly as words are
capable of making it clear, the consequences of his
recalcitrance were drummed into the appellant's
consciousness:

"THE COURT: Well, I tell you what's going to
happen. You're going to get tried on the 20th. You
are going to be allowed twenty strikes; the State
will be allowed ten. We are going to bring about
forty-five jurors to try you and you're not going to
get away with this by not taking any action.

You're going to get tried one way or another on
20th because that's what you wanted. You've been
playing fast and loose with this Court all along and
I'm sick of it. I can tell you that.

You're going to have your, tomorrow, you are
going to have your suppression hearing which is
when you asked for it. You wanted a postponement
to the 15th and you're going to be tried on the
[20th]. And if you don't have a lawyer, that's, that's
a matter that you are going to take up."

\*     \*     \*

"All you can give me is the old echo, 'I want a law-
yer.' Well, you're not going to have a lawyer unless

you get some, agree to the postponement of this case. You won't do that, which is your Constitutional right."

\*     \*     \*

"MR. HOWELL: Your Honor, I'm not going to act as my own counsel.

THE COURT: Well, then, you're going to be tried in this case without counsel."

\*     \*     \*

"THE COURT: The State doesn't expect anything. You have got a choice to make. You don't want to make a choice, as we talked a hundred times. You have made your mind up; you're determined that you are going to get both your Constitutional rights, one to a speedy trial and one to the assistance of counsel, but you won't give an inch and neither will the Court."

On the day of the suppression hearing, Judge Mackey tried yet again to persuade the appellant to be reasonable:

"THE COURT: All right. All right. Now, I would advise you, Mr. Howell, that the form that you have as to your rights to an attorney apply equally today, and your right to a speedy trial, of course, applies today, and you are insisting upon a speedy trial.

I believe, I know that you've been advised by Judge Evans once, if not more often, that the Court would grant you a postponement of the trial if you wish one. All you have to do is indicate that you wish one. And you have steadfastly, I understand, refused to ask for a postponement. And since we're under an obligation to try you within 180 days of your indictment — isn't that the rule?

MR. PODOLAK: Yes, sir.

THE COURT: — the indictment, which was August 21, 1979, we have to try you by February 21st, or February 20th, the trial's set for February

20th, as you know. Otherwise, there's a possibility that you can ask to be set free and all charges against you would have to be dropped.

Now, for this reason we propose to try you for the offenses with which you're charged on the 20th of February unless you ask for a postponement, in which case, of course, you would be willing to go beyond 180 days without having the charges dropped. But since you're not, you won't do that, why, we'll go ahead."

This appellant knew full well what he was doing.[2] This appellant knew full well that trial without counsel was the unavoidable consequence of his insistence upon trial within 180 days. The choice was his. That he should not now be required to live with his choice would be unconscionable.

Waiver by the appellant, moreover, by word or deed, is beside the point. The issue is whether Judge Evans committed error in obeying the mandatory command of Rule 746. Trial without counsel was simply the inevitable and incidental consequence of the Rule's precise rubrics, which are meant to be followed. Either party, of course, defendant or State, may seek dispensation from those mandatory provisions for "extraordinary cause" (now "good cause") shown, but neither party did. The State did not need or wish a postponement. It was ready for trial at all times. Indeed, it went to trial within the time limit. The defendant not only did not seek a postponement but affirmatively disavowed

---

2. It cannot be maintained that his uncounseled defense at the trial table proves, *ipso facto,* that his decision was unintelligent. From the strategic point of view of a defendant able to think two moves ahead (to appellate review) rather than one move ahead (to the trial table), the best defense, when there is little else to go with, may well be to present an inadequate defense inadequately rather than to present an inadequate defense adequately. The very fact that we are now much perplexed with a convoluted issue demonstrates the strategic wisdom of his choice. An adequately presented but unsuccessful defense yielding only a contention of evidentiary insufficiency would not perplex us at all. Was this appellant's choice of strategies, therefore, unintelligent or was it rather intelligence at a more Byzantine level of subtlety? If appellate review, constrained to look no more than one chess move ahead, is pitted against opponents capable of thinking two chess moves ahead, it will always be outwitted. We cannot shut our eyes to the crude genius of the jailhouse bar.

any desire for postponement, even when the overwhelming advantages were explained to him by judge, privately retained counsel and public defender alike. Without a request by the State and over the express objection of the appellant, it would have been the height of rashness for Judge Evans to have ordered *sua sponte,* without any color of authority for such unilateral action in the terms of the Rule, that the mandatory provisions of that rule be disobeyed. If he had erred in that direction, on an admittedly close and difficult question, he would have inflicted upon the society he serves the extreme sanction of never being able to bring to the trial table one we now know to be a convicted murderer. That he did not take it upon himself, without any authority, to run so grave a risk is hardly reversible error.[3] Judge Evans simply followed the Rule.

### ENTITLEMENT OF THE APPELLANT TO TOTAL DISMISSAL OF CHARGES AND NOT JUST REVERSAL AND REMAND

Having decided the second issue as we have, it follows that if the appellant is not even entitled to reversal and remand, he thereby is not entitled to a total dismissal of all charges against him so as to bar retrial.

*Judgments affirmed; costs to be paid by appellant.*

---

3. Philosophers and jurisprudes might long and profoundly debate the question of which was the greater right and which was the lesser. It is no simple question. From the point of a defendant, it might be argued that the constitutional right to counsel is weightier than the sub-constitutional right to trial within 180 days. From the point of view of society, however, it might be argued that the sanction of dismissing the charges is weightier than that of simply remanding for a retrial and, therefore, the peril more to be avoided. Both points of view must be considered by an impartial judicial figure. We do not presume to answer the question; we only point out that there is no easy answer.